UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

LAURA S. CLARK, STEPHEN R.          )
CLARK, and SEJCO VENTURES,          )
LLC,                                )
                                    )
                  Plaintiffs        )
                                    )
            vs.                     )          CAUSE NO. 3:08-CV-283 RM
                                    )
OAKHILL CONDOMINIUMS                )
ASSOCIATION, INC., et al.,          )
                                    )
                  Defendants        )

## OPINION AND ORDER

A condominium association's bylaw, purportedly adopted to keep the condominium development from turning into student housing, operated to keep one unit's owners from renewing their lease with an adult white insurance agent. This suit under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, ensued. Plaintiffs Laura S. Clark and Stephen R. Clark and their corporation SEJCO (the unit's titleholder) sought a preliminary injunction, and the court conducted an evidentiary hearing from September 5 through September 10. This opinion is intended to satisfy the court's obligation concerning findings and conclusions. For the reasons that follow, the court denies the preliminary injunction motion because the Clarks and SEJCO have no reasonable likelihood of success on the merits of their claims of housing discrimination.

I.

Defendant Oakhill Condominiums Association, Inc. is the governing body of the Oakhill Condominiums, a complex located less than a mile from the University of Notre Dame campus in South Bend, Indiana. Plaintiffs and spouses Laura and Stephen Clark own unit D-2 in Oakhill. Defendant David Anthony is president of the Association's board of directors. Defendants Tom Regnier, Anthony Matarazzo, Craig Weyers, Kevin Regan, and Michelle R. Ferguson are board members.

Construction of the Oakhill Condominiums began in 1988 and was completed by 1991. It now has 101 units. The developers created the Oakhill Condominium Association to manage the property. At first, the units were primarily owner-occupied and leases to unrelated third-parties originally were unrestricted, as long as they were for at least six months. By 1996, several owners were concerned about the number of units being leased to students; those owners didn't want the development to be like a nearby apartment complex that catered to students. Those owners were concerned both about the nature of the community and about the ability to obtain mortgages in a student rental environment.

This concern led the owners to adopt a bylaw amendment that limited leases to unrelated third-parties to a term of one year and one lease per condominium during the term of ownership, but provided the Board with authority to allow for exceptions. All 101 people who owned units at that point

were "grandfathered": the lease limitations didn't apply to them.[1] Without the grandfathering, the 1996 amendment wouldn't have passed. Grandfathering is used commonly in condominium association bylaws.

Thirty-eight original owners remain at Oakhill today. About ten percent of the Oakhill owners occupy their units as primary residences. Of the others, some lease their units to unrelated third-parties, and some owners allow their children to live in the unit while attending Notre Dame. If a blood relative of an owner lives in the owner's condominium, the owner may lease to the relative's roommates; such units are considered to be owner-occupied since a blood relative occupies the unit. Ten of the 101 Oakhill units were offered for sale at the time of the hearing, a portion that has been fairly consistent since 1989 (though it's higher during football season, when the units are easier to sell).

Steve Clark's father John purchased a condominium at Oakhill in the late 1990's. He rented it occasionally and used it for visits to Notre Dame, such as for football games. When John decided to sell the unit in 2004, Steve and Laura Clark looked into buying it. The Clarks (both of whom were practicing attorneys) knew of the 1996 amendment and the one-year/one-lease rule, as well as the Board's discretion to grant exceptions. The Clarks intended to use unit D-2 solely as a rental property, and before purchasing the unit, they so informed Oakhill property manager Sherry Scott. Ms. Scott told the Clarks that the Board was empowered

---

[1] The Board later grandfathered an owner who acquired his unit some time around the recording of the amended bylaws.

to grant exceptions to the 1996 one-lease limit and that the Board routinely granted such exceptions. The Clarks also knew John Clark had leased the unit, though they didn't know how often. The Clarks didn't discuss the limit with any board member, but might have discussed it on site with a handful of other owners.[2]

The Clarks and SEJCO bought Oakhill unit D-2 from John Clark in June 2004. They didn't intend to reside in the unit, at least unless and until one of their children (the oldest of whom was born in 1996) might attend the University of Notre Dame.

Ms. Scott attempted to help the Clarks lease unit D-2. She offered to find tenants, told the Clarks that an egress window needed to be installed if they wished to rent out basement rooms as bedrooms, and suggested a contractor to install the egress window. Upon purchasing unit D-2, the Clarks engaged Kelly Foster, an area realtor and property manager, to manage their unit. Ms. Scott also told Ms. Foster that exceptions to the one-lease rule were "routinely made" as long as she receives the paperwork on time; Ms. Scott also told Ms. Foster that the Board always listens to her.

In October 2004, the Clarks leased unit D-2 for nine months[3] to Dilip and Mitha Pal, who were from India. Mr. Pal was attending and working at the

---

[2] Mr. Clark vaguely remembers other owners telling him they rented frequently.

[3] The nine-month term was chosen because, while the Pals needed to move in quickly because their living space in Sacred Heart parish was needed, nobody was sure if Mr. Pal would remain with Notre Dame beyond the 2004-2005 school year.

University of Notre Dame. Ms. Scott required the lease to be on an Oakhill form rather than the form Ms. Foster ordinarily used. In 2005, the Clarks asked the Board to allow the Pals' lease to be extended for another year; the Association Board approved that request for an exception to the one-lease limit. The Pals vacated the unit when that lease expired. Sometime during or after the expiration of the Pals' second lease,[4] Ms. Scott made a comment to Mr. Clark about the odor of spicy cooking in unit D-2; that comment is discussed at greater length later in this opinion.

In May 2006, the Board received a request from another Oakhill owner (John Longar) for a second exception to the one-lease limit. This was the first time the Board had received a request for a second exception (for a total of three leases to non-blood relatives). Mr. Longar's request triggered discussion among board members about whether exceptions to the one-lease rule should be capped somehow or granted endlessly. The Board decided that some sort of cap should be imposed, but took no immediate action toward that end. The Board approved the request, but Ms. Scott notified Mr. Longar on June 22, 2006 that the Board had indicated it was unlikely to approve any more exceptions for Mr. Longar.[5]

---

[4] Mr. Clark says he viewed this as an extension of the first lease rather than a second lease. The court is unpersuaded that Mr. Clark, an attorney, believed that. A new lease, with a new lease term, was drawn up and executed. Further, the 1996 amendment limited leases to a maximum of one year, so no single lease could cover the Pals' twenty-one month occupancy.

[5] Mr. Longar ultimately sold his unit.

On June 26, 2006, Ms. Scott mentioned to Mr. Clark that the Board was considering limiting future exceptions to the lease limit. Mr. Clark, then working at a large law firm, considered the permissibility of such action a perfect research topic to assign to a summer intern. The summer intern produced the decision of the Indiana Court of Appeals in <u>Villas West II of Willowridge Homeowners Ass'n, Inc. v. McGlothin</u>, 841 N.E.2d 585 (Ind. Ct. App. 2006), which Mr. Clark read as precluding restrictive covenants that prevent condominium owners from leasing to unrelated third persons.

When the Pals moved out, Mr. Clark spoke with Ms. Scott about his wish for a new tenant (which would require a new exception from the Board) and told her he thought any restriction on his request would be illegal under the court of appeals' decision in <u>Villas West II</u>. After initial defensiveness, Ms. Scott agreed to work with Mr. Clark. The topic arose again in November 2006, when David Ber emerged as a prospective tenant for unit D-2. Ms. Scott told Mr. Clark not to bother submitting a lease packet for Board consideration in light of the board members' new concerns. Mr. Clark again discussed <u>Villas West II</u> (and sent Ms. Scott a copy) and said he planned to submit a lease packet. If the Board approved it, Mr. Clark said, there would be no problem; otherwise, there would be an issue that would need to be dealt with.

When the Board received the Clarks' request for an exception to the one-lease limit for Mr. Ber and learned that Mr. Clark had indicated that the Board might be opening itself to liability if it denied his request, the Board decided the

bylaws placed it in an undesirable position by making exceptions discretionary. The Board decided to try to amend the bylaws with an increased maximum that couldn't be enlarged. The Board decided on three as the maximum because no owner had ever requested approval of more than three leases.

On December 12, 2006, Ms. Scott notified Mr. Clark that the Board had approved Mr. Clark's "request for a second leasing exception," but also informed him of the three-lease no-exception bylaw amendment the Board planned to propose.

On March 8, 2007, the Board sent owners notice of the 2007 annual meeting, the proposed amendment to the bylaws, and biographies of candidates for the Board. The notice didn't specify that pre-1996 owners wouldn't be subject to the three-lease ceiling, didn't specify that pre-2007 leases would count against the three-lease ceiling, and didn't disclose that the Board included at least two pre-1996 owners who would be exempt from the three-lease cap.

On March 17, 2007, the Clarks sent an email to those owners whose email addresses they were able to collect. Citing the Indiana Court of Appeals decision in <u>Villas West II</u>, the email told the owners that "current Oakhill By-laws restricting rentals violate federal and likely Indiana law." The email went on to say that the proposed amendment to the bylaws "violates the law as well" and urged recipients to vote "no" on the amendment. The Clarks stated, as fact rather than opinion, that owners' children's roommates would be subject to the three-lease rule and also informed the recipients that at least two of the board members

wouldn't be subject to the amendment because they are grandfathered and so may rent their units as often as they wish. Lest the point be missed, the email added that the "Board's current policies and proposed By-law amendment also are likely to result in costly legal disputes, which will cost *all* of us money. All it will take is one rejected renter to walk over to the law school clinic and enlist their help." The Clarks then informed the recipients that they depend on rental income to pay the cost of owning their unit.

On March 19 (two days later), the Board sent a letter to all owners in response to the Clarks' email. The Board said, in part,

> The existing By-Law amendment concerning leasing was adopted by Oakhill owners in April 1996. . . .
> This By-Law amendment was adopted by owners because the vast majority believed it was not in their best interests to allow at-will, unlimited leasing of Oakhill units. Property values at Oakhill have increased substantially since the By-Law amendment was adopted, and most owners have expressed the belief that Oakhill, under the current system, provides a much better living environment than other apartment and condominium complexes in the general area.
> An amendment to the existing By-Laws is being proposed because a review of the existing By-Law by Oakhill legal counsel advised that, while lawful as currently written, it would be in the association's best interest for the Board not to have discretionary power over any requested exceptions, in order to avoid the appearance of favoritism when questions of unit leasing arise. Under the proposed change, a unit owner could lease his or her unit up to three times (up from one time now), but the Board could not consider any exceptions to this limitation of three leases. With this change, every owner who purchased a unit since the enactment of the original amendment in April 1996 has an equal opportunity to lease the unit up to three times. . . .

Board president Anthony and board member Weyers were among the grandfathered pre-1996 owners. No board member took any action to exclude Mr.

Anthony or Mr. Weyers from voting on the restrictive covenants, and Messrs. Anthony and Weyers participated in that vote. The Association and Board have no conflict of interest policy. The Association passed the amendment to the bylaws on March 31, 2007 by a vote of sixty-three in favor, five against, and one abstaining.

The Clarks didn't tell Mr. Ber about the 2007 bylaw amendment because they believed the 2007 amendment was unenforceable. The Clarks didn't tell Ms. Foster (their property manager) about the new bylaw until May 2008. The Association served an eviction notice on Mr. Ber at the end of May 2008, and Mr. Ber vacated the unit.

Many rental units are available in the areas around Oakhill. Those units generally rent for from $450 to $750 per month and include Section 8 rental units. Board President Anthony, a pre-1996 owner, currently rents his unit to Notre Dame students for $1,500 per month. Board member Weyers, also a pre-1996 owner, currently rents his unit to Notre Dame graduate students for $1,250 per month.

II.

The Clarks and SEJCO filed this suit against the Association and the board members. The Clarks allege jurisdiction under 28 U.S.C. §§ 1331 for violations of the Federal Fair Housing Act [42 U.S.C. § 3601 *et seq.*] and 1332 because complete diversity exists and the amount in controversy exceeds $75,000.

The Clarks assert one federal claim under the Fair Housing Act, 42 U.S.C. §§ 3604, 3613(c)(1), 3613(c)(2), and state law claims for violation of Indiana Fair Housing Act, IND. CODE § 22-9.5-5-1, tortious interference with contract, tortious interference with business, breach of fiduciary duty, fraud, declaratory judgment, and slander of title. They seek a preliminary injunction only on their state and federal housing discrimination claims.

A.

"A party seeking a preliminary injunction must demonstrate that he is reasonably likely to succeed on the merits, that he is experiencing irreparable harm that exceeds any harm his opponent will suffer if the injunction issues, that he lacks an adequate remedy at law, and that the injunction would not harm the public interest." Coronado v. Valleyview Pub. Sch. Dist. 365-U, No. 08-1850, 2008 WL 3316022, at *4 (7th Cir. Aug. 12, 2008). "In the first phase of the analysis, the court decides only whether the plaintiff has any likelihood of success – in other words, a greater than negligible chance of winning – but in the second phase, the court evaluates that likelihood of success, as the analysis turns to a 'sliding scale' under which a lesser likelihood of success can be made sufficient by a greater predominance of the balance of harms. In performing this balancing, the court bears in mind that the purpose of a preliminary injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." AM

General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 804 (7th Cir. 2002) (internal citations and quotations omitted).

The first question to be resolved is whether the Clarks have established a better than negligible chance of winning at trial under either their state or federal housing discrimination claim.

1.

The federal Fair Housing Act makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The federal Act was intended to promote "open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." Metropolitan Housing Dev. Corp. v. Village of Arlington Heights ("Arlington Heights II"), 558 F.2d 1283, 1289 (7th Cir. 1977) (quoting Otero v. New York City Housing Auth., 484 F.2d 1122, 1134 (2d Cir. 1973)). Courts apply the Act's terms liberally. See Arlington Heights II, 558 F.2d at 1289 (citing cases that "have responded to the congressional statement of policy by holding that the Act must be interpreted broadly").

A Fair Housing Act plaintiff may proceed under either of two theories: disparate treatment (intentional discrimination) and disparate impact; the Clarks argue their claims under a disparate impact theory. "[U]nder some circumstances,

a violation of § 3604(a) can be established by a showing of discriminatory effect without a showing of discriminatory intent." <u>Arlington Heights II</u>, 558 F.2d at 1290. The <u>Arlington Heights II</u> plaintiffs argued that once a racially discriminatory effect is shown, a violation of § 3604(a) is necessarily established, but the court declined to extend the reach of the Act that far: "Although we agree that a showing of discriminatory intent is not required under section 3604(a), we refuse to conclude that every action which produces discriminatory effects is illegal. Such a per se rule would go beyond the intent of Congress and would lead courts into untenable results in specific cases. Rather, the courts must use their discretion in deciding whether, given the particular circumstances of each case, relief should be granted under the statute." 558 F.2d at 1290.

The <u>Arlington Heights II</u> court set forth four "critical factors" to use in determining under what circumstances conduct that produces a discriminatory impact but was taken without discriminatory intent violates § 3604(a): (1) the strength of the plaintiff's showing of discriminatory effect; (2) whether there is some (though not much is required) evidence of discriminatory intent; (3) the defendant's interest in taking the action; and (4) whether the plaintiff seeks to compel affirmative conduct or to restrain interference with individual property owners. 558 F.2d at 1290.[6]

---

[6] Various courts also have adopted a Title VII-like disparate impact analysis providing that once a plaintiff establishes a prima facie case, the defendant must come forward with legitimate, non-discriminatory reason for its action, which the plaintiff may rebut by showing other less onerous options that the defendant might have implemented. Most of those cases involve challenges to governmental actions. *See, e.g.,* <u>Hispanics United of DuPage County v. Village of</u>

2.

The Indiana Fair Housing Act, IND. CODE § 22-9.5-1 *et seq.*, borrows heavily
from the federal Act; its purpose is "to provide rights and remedies substantially
equivalent to those granted under federal law." IND. CODE § 22-9.5-1-1. Similar to
42 U.S.C. § 3604(a), Indiana Code § 22-9.5-5-1(a) provides that "[a] person may
not refuse to sell or to rent after the making of a bona fide offer, refuse to negotiate
for the sale or rental of, or otherwise make unavailable or deny a dwelling to any
person because of race, color, religion, sex, familial status, disability, or national
origin."

Indiana courts recently addressed a claim the Clarks consider much like
their own, though those claims were brought only under the federal Act. Algy and
Edna McGlothin bought a home in Kokomo's Villas West subdivision subject to
various restrictions, including a prohibition on the leasing of their home so as to
"maintain[] the congenial and residential character of Villas West II and for the
protection of the owners with regard to financially responsible residents." The trial
court held the no-lease covenant had a greater adverse effect on racial minorities
and there was no legitimate non-discriminatory reason for the no-lease covenant,

Addison, Ill., 988 F. Supp. 1130, 1161-1162 (N.D. Ill. 1997).
    The Clarks' reply brief advances such a burden-shifting argument, arguing that the
Association must establish a "business necessity" for its actions, relying on regulations found in
24 C.F.R. § 107.51. Those regulations don't apply to the Association. 24 C.F.R. § 107.10 provides
that the regulations are intended to assist in preventing discrimination "in the sale, rental, leasing,
or other disposition of residential property and related facilities or in the use or occupancy thereof
where such property or facilities are owned or operated by the Federal Government, or provided
with Federal assistance by the Department of Housing and Urban Development . . . ." The federal
government doesn't own the Oakhill complex and there is no allegation that the complex receives
federal assistance from HUD.

and the court of appeals affirmed. <u>Villas West II of Willowridge Homeowners Ass'n, Inc. v. McGlothin</u>, 841 N.E.2d 585, 608 (Ind. Ct. App. 2006). This is the opinion Mr. Clark sent to the Board (through Ms. Scott) and several of the other owners in support of his opposition to what became the 2007 bylaw amendment.

On May 13, 2008, the Indiana Supreme Court reversed on the issue of disparate impact. <u>Villas West II of Willowridge Homeowners Assoc., Inc. v. McGlothin</u>, 885 N.E.2d 1274 (Ind. 2008). The court discussed and rejected the approach in <u>Arlington Heights II</u>, 558 F.2d 1283, to analyzing the issue of disparate impact under the FHA, "and, with it, any search for pretext in a disparate impact case" under the FHA. 885 N.E.2d at 1283. The court stated that while "[f]ederal district courts in the Seventh Circuit are of course obligated to follow Seventh Circuit precedent, including <u>Arlington Heights II</u>, [w]e are not so restricted," 885 N.E.2d at 1282, and instead concluded that

> to establish a right to disparate impact recovery under the FHA, a plaintiff must establish a prima facie case by demonstrating that a policy or practice actually or predictably has a significantly adverse or disproportionate impact on a protected class. To rebut this showing, the defendant must demonstrate that its policy or practice has a manifest relationship to a legitimate, nondiscriminatory interest. The plaintiff may then overcome the defendant's showing by demonstrating that a less discriminatory alternative would serve the defendant's legitimate interest equally well.

885 N.E.2d at 1283. The supreme court noted, too, that "[r]estrictions found in a declaration (like those found in a master deed) are clothed with a very strong presumption of validity which arises from the fact that each individual unit owner

purchases his unit knowing of and accepting the restrictions to be imposed." 885 N.E.2d at 1279 (internal quotation omitted).

The Clarks argue that the court of appeals' reasoning is stronger, and Mr. Clark testified that he has been told that Indiana may lose federal funding if the supreme court's holding stands. The task of a federal district court applying state law, though, is not to select the best view of state law, but, rather, to predict how the state's highest court will decide the issue. *See* <u>Abstract & Title Guar. Co., Inc. v. Chicago Ins. Co.</u>, 489 F.3d 808, 811 (7th Cir. 2007). The Clarks haven't persuaded the court that the Indiana Supreme Court is likely to interpret the state housing discrimination law any differently than it interpreted that's law's federal template less than six months ago. One who wants state law changed should sue in state court, not in federal court. *See* <u>Knutson v. UGS Corp.</u>, 526 F.3d 339, 341 (7th Cir. 2008) ("[A] plaintiff who needs an adventurous interpretation of state law to prevail should sue in state court rather than in federal court."); <u>Chang v. Michiana Telecasting Corp.</u>, 900 F.2d 1085, 1088 (7th Cir. 1990) ("[A] litigant whose case depends on a change in state law had best start in state court.").

Accordingly, the court analyzes the preliminary injunction motion solely under federal law. If the Clarks can't win an injunction under federal law, their motion cannot succeed under Indiana's more restrictive view; if federal law warrants the injunction, the court needn't consider Indiana law.

B.

15

The court turns, then, to the four <u>Arlington Heights II</u> factors. The fourth factor is easily described: the Clarks want the defendants enjoined from enforcing any restriction on their ability to lease unit D-2; they don't seek any affirmative requirement that anyone lease to minority tenants. The third factor (the stated reason for the restriction) is somewhat more disputed because the Clarks have implied that the board members (at least the grandfathered board members) were seeking a competitive leg up in the business of renting to students. But given the overwhelming vote from owners who weren't grandfathered, the court finds that the defendants' interest in adopting the 2007 amendment was to maintain the character of the Oakhill development.

The other two <u>Arlington Heights II</u> factors require considerably more discussion.

## 1.

The defendants argue that the Clarks have no evidence of intentional discrimination. While this is the least important of the factors, a plaintiff must show at least some (though not much) evidence of intentional discrimination to prevail. *See* <u>Arlington Heights II</u>, 558 F.2d at 1290. The Clarks point to three classes of proof to meet this burden: statements by property manager Sherry Scott, actions by the Board, and opinions of their expert, Dr. Nathaniel Lauster, whose opinion testimony also comprises the Clarks' evidence of disparate impact. The court begins with Ms. Scott's statements as proof of discriminatory intent,

then examines the Board's conduct as proof of discriminatory intent, then turns to Dr. Lauster's testimony.

## 2.

Evidence concerning the statements by Ms. Scott is conflicting. Mr. Clark testified[7] that on two to four occasions after the Pals began their twelve-month lease, Ms. Scott telephoned Mr. Clark and complained about an offensive smell of curry frequently coming from unit D-2. Mr. Clark testified that he asked if other owners were complaining, and Ms. Scott said no, she (Ms. Scott) was complaining. While testifying at the hearing, Mr. Clark said he wasn't accusing Ms. Scott of lying about the odor — but he (Mr. Clark) never smelled it. Mrs. Clark also testified that she never smelled it.

---

[7] The United States District Court for the Northern District of Indiana has adopted the Indiana Rules of Professional Conduct as governing conduct in this court. L.R. 83.5(f). Rule 3.7(a) of the Indiana rules provides:

> A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
> (1) the testimony relates to an uncontested issue;
> (2) the testimony relates to the nature and value of legal services rendered in the case;
> (3) disqualification of the lawyer would work substantial hardship on the client.

Mr. Clark is one of two attorneys representing himself, his wife, and SEJCO. When he took the stand to testify, the court assumed his testimony would relate to uncontested issues. As is clear from the discussion about the conflicts between his testimony and Ms. Scott's testimony, it didn't turn out that way.

The court assumes some other exception allowed Mr. Clark to serve as both advocate and witness, but that exception is not apparent to the court. As the case continues, the court urges counsel to be prepared to explain just what the court is missing. Unless some exemption to the victim-advocate rule of Indiana Rule of Professional Conduct 3.7(a) is identified, the court doesn't anticipate going to trial and again seeing Mr. Clark cross-examined on the law and his theory of the case, or seeing a final argument in which the Oakhill attorney again is called upon to question the credibility of a witness who also serves as opposing counsel.

Ms. Scott testified that she detected the curry odor when she entered unit D-2; she believed, but wasn't sure, that she entered the unit at Mr. Clark's request (perhaps about a cable issue) after the Pals had vacated the unit. She testified that she reported back to him that the unit looked fine except for an odor of curry. Mr. Clark asked how bad the odor was, and Ms. Scott said it was bad. Ms. Scott said one owner had commented to her about the curry smell, and she told that owner to contact Mr. Clark. Ms. Scott denied any animus against the Pals, whom she described as very gracious people.

Mr. Clark didn't mention the curry comments to the Board until the 2007 amendments surfaced. In emails to the Board after Mr. Clark reported the curry concern, Ms. Scott said she was responding to a complaint from another owner and also said there had been no complaints about the Pals.

Given the relationship between property manager Scott and leasing unit owner Clark, a report of a cooking odor carries no tinge of bigotry. There is no evidence that the odor didn't exist, or that Ms. Scott's report or reports were false. A property manager with a wholly non-discriminatory heart would need to report a continuing cooking odor to an absent owner, whether it involved curry, garlic, or apple pie. That the odor was of curry and the tenants were Indian doesn't convert a business-related factual statement into evidence of discrimination.

The Clarks also point to what they remember as an accusation of theft by Ms. Scott against Mrs. Pal. A shopping cart was found in the Oakhill development. Ms. Scott, who had seen Mrs. Pal (who didn't drive) walking down the street while

returning from a nearby grocery street on prior occasions, thought Mrs. Pal might have brought the cart to the development and called Mr. Clark. Ms. Scott believes she asked Mr. Clark to ask Mrs. Pal to take shopping carts back to the grocery store in the future; Mr. Clark believes Ms. Scott accused Mrs. Pal of stealing the cart. Both agree that Mr. Clark told Ms. Scott to look into the possibility that a student took the cart. The Clarks see this accusation of theft (as they recall it) as evidence of anti-Indian bias.

During final argument, the court asked Mr. Clark whether the suggestion that the cart had been taken by a student of Swedish descent would constitute evidence of bias against Swedes, and Mr. Clark conceded the shopping cart incident is proof of discriminatory intent only when viewed in context of the curry odor complaints. Since the court has found the curry comments not to be circumstantial evidence of discrimination, nothing in those comments casts an unfavorable light on the shopping cart comment. Neither of Ms. Scott's comments amount to the proof of discriminatory intent a federal housing plaintiff must present.[8]

3.

---

[8] Neither party addressed why, in the absence of any evidence that Ms. Scott influenced the Board or the association in adopting the 2007 bylaw amendment, her comments would amount to proof of discriminatory intent in the adoption of those amendments. Since neither side addressed this issue, neither need the court.

As further proof of discriminatory intent, the Clarks note that discussion of a covenant began when the Pals were renters and the Board knew the Pals had an option to extend lease for another year. The Clarks also contend that the 2007 bylaw amendment departed from the Association's standard practice because it didn't grandfather all then-existing owners, applied retroactively in the sense that pre-2007 leases counted against the three-lease limit, and constituted a complete turnabout from the practice of granting extensions routinely. None of these points support an inference of discriminatory intent.

So far as this record shows, only one prior bylaws amendment grandfathered existing owners. One previous amendment hardly establishes a standard practice. Further, the only evidence before the court is that the 1996 amendment couldn't have passed but for the grandfathering. The 63-5-1 vote in 2007 eloquently demonstrates that no grandfathering provision was required for the three-lease limit.

No evidence supports the Clarks' proposition that applying the 2007 amendment to pre-2007 leases amounted to a break from any standard practice. The 1996 amendment couldn't apply to any pre-1996 leases regardless of any consideration of "retroactivity" because the 1996 limit didn't apply to anyone who owned a unit when the amendment was adopted, regardless of pre-1996 leasing history. "Retroactivity" was resolved by the grandfathering provision and that provision alone.

The proposition that the 2007 bylaws amendment is proof of discriminatory intent because it amounts to a complete turnabout of the Board's previous regularity in approving excess leases is the epitome of bootstrapping. Of course it was a complete turnaround. The Board didn't want to have to consider any more requests for exceptions, so it proposed the 2007 amendment and the Association approved it.

That the Pals were tenants known to have an option to lease also is completely beside the point in the search for discriminatory intent. If those facts amount to independent evidence of discriminatory intent (as opposed to providing some corroboration of other evidence of intentional discrimination), the only inference-free restriction on leasing would occur when no minority tenants are to be found in the development. The complete absence of minority tenants would amount to far greater support for an inference of discriminatory intent than the presence of a minority couple when the restriction was adopted.

None of the Board's actions amount to evidence — even minimal evidence — of intentional discrimination.

4.

Dr. Nathaniel Lauster is an assistant professor of sociology at the University of British Columbia. His teaching and study focuses on demography and housing discrimination. The Clarks asked Dr. Lauster to assess the likely impact of the 2007 bylaw amendment. Dr. Lauster defined the central question as, "Have

minority individuals been particularly likely to rent in the housing market surrounding Oakhill Condominiums, and are they therefore disproportionately influenced and adversely affected by allowing or restricting rentals of condominiums?"

Dr. Lauster began his work by examining census data, the use of which he says is universally accepted practice in sociology. In looking at census data for the county, for Oakhill's census tract, and for census tracts touching upon the Notre Dame campus, he found that the population around Notre Dame was more ethnically diverse than the county as a whole, though the Oakhill tract was less ethnically diverse. He also found that the tract containing Oakhill had higher rental rates than the entire area surrounding Notre Dame or the county as a whole. He found that minorities rent at a higher rate than non-minorities, but that minorities represent a lower share of renters in the Oakhill tract than in the campus area or the county.

Dr. Lauster reached the following opinions: (1) minorities were more likely than non-Hispanic whites to rent their homes the Oakhill area, so (2) policies that restrict the rental of a housing unit disproportionately restrict minorities from moving into that housing unit. This is the reasoning upon which the Clarks' disparate impact claim rests.

Dr. Lauster opined that given the condominiums' proximity to Notre Dame and their high proportion of renters, the lack of ethnic diversity in Oakhill's census tract "implies that some selective force outside of the scope of the

statistical analysis here has prevented minority individuals from moving into these areas." He also opined that "[r]esearch suggests that racial and ethnic discrimination on the part of landlords is widespread in the United States. Correspondingly, it may be a selective force that has historically prevented minority individuals from moving into the census tract and block area where Oakhill Condominiums is located." This is the reasoning that the Clarks say helps them meet their burden of coming forth with some evidence of intentional discrimination.

Principles of sociological discourse may well differ from what courts look for in housing discrimination cases, but the court cannot credit Dr. Lauster's opinions with any weight whatsoever in the Clarks' effort to meet their Fair Housing Act burden. It is too simplistic to say that because minorities rent more than non-minorities, any restriction on rentals disparately impacts minorities. At final argument, the court inquired of Mr. Clark whether the same conclusion would flow from any rental restriction in any area in which minorities rent at a higher rate than non-minorities. Mr. Clark responded not necessarily because Dr. Lauster took into account the unique nature of the Oakhill restrictions. But Dr. Lauster did no such thing. Dr. Lauster simply assumed (as does everyone) that the Oakhill restriction limited the rental availability of Oakhill condominiums, then concluded that the restriction affects minorities more than non-minorities because minorities are a larger share of area renters than they are of the area residents as

a whole (or at least were in 2000, the most recent year for which census data is available).

None of that reasoning reveals anything about the impact of the 2007 bylaws amendment at Oakhill. Dr. Lauster didn't look at the cost of rental housing in the census tracts he studied, but Mr. Wyman's testimony, coupled with the rents charged by Mr. Weyers and Mr. Anthony, indicates that it costs considerably more to rent a condominium at Oakhill than to rent most places around the Notre Dame campus. Dr. Lauster made no effort to account for the expense of a rental unit or the financial ability of any person in any census tract. Dr. Lauster explained, as the court understood him, that he made no effort to include financial ability in his evaluation because economic status is itself affected by race.

This might be sound sociological analysis, but the task of a court in a housing discrimination case is to identify the impact of a specific obstacle to housing, not the impact of a generic obstacle. Nothing about Dr. Lauster's analysis zeroes in on the Oakhill bylaws amendment rather than any other factor that might reduce the supply of rental units in the area around Notre Dame. Mr. Clark told the court in final argument that considering other factors, as the defendants' experts said was necessary for statistical validity, "would require all sorts of extrapolations and other statistical wizardry but would lead to wholly unreliable and meaningless results." The record from the preliminary injunction hearing doesn't persuade the court that Mr. Clark is correct.

The defendants' econometrics expert, Dr. Virginia Shingleton, criticized Dr. Lauster for (among many other things) not employing regression analysis. The court agrees. To be sure, a failure to use regression analysis or to account for every possible variable doesn't render every disparate impact opinion unreliable, <u>Bazemore v. Friday</u>, 478 U.S. 385, 400 (1986), but given Dr. Lauster's omission of so many potential ingredients of housing use, regression analysis or something designed to accomplish the same thing was needed to help the court isolate the impact on minority renters of a restriction on rentals at Oakhill.

> A regression takes a dependent variable . . . and tests it against a number of independent variables. The independent variables are chosen before the regression is run . . . . Once the data is collected, the researcher runs a regression on each variable, which shows the effect of that variable, in isolation, on the dependent variable. If a variable is found to have no meaningful correlation to the dependent variable, it is discarded.

<u>A Woman's Choice-East Side Women's Clinic v. Newman</u>, 305 F.3d 684, 713 n.3 (7th Cir. 2002); *see also* <u>Bazemore v. Friday</u>, 478 U.S. at 403 n.14 ("the very purpose of a regression analysis is to organize and explain data that may appear to be random"); <u>Zenith Electronics Corp. v. WH-TV Broadcasting Corp.</u>, 395 F.3d 416, 419 (7th Cir. 2005) ("[S]ocial science has tools to isolate the effects of multiple variables and determine how they influence one dependent variable . . . . Perhaps the leading tool is the multivariate regression, which is used extensively by all social sciences.").

Dr. Lauster's decision not to account for rental prices of Oakhill units and the ethnic mix of persons reasonably able to afford an Oakhill unit leaves the

court unable to evaluate the impact of the 2007 bylaws amendment. Dr. Lauster's numbers are too rough to be useful. Statistics used in other disparate impact cases highlight the difference. For example, in <u>Allen v. City of Chicago</u>, 351 F.3d 306 (7th Cir. 2003), which considered the alleged disparate impact of tests for police sergeant positions in the Chicago Police Department on African Americans and Hispanics, the court looked at the impact on minorities who took the test, not on all African Americans and Hispanics in Chicago. In <u>Bennett v. Roberts</u>, 295 F.3d 687 (7th Cir. 2002), the plaintiff brought claims of intentional discrimination and disparate impact. Her disparate impact claim fizzled because she couldn't identify a hiring practice that produced the alleged disparate impact, but she also attempted to use her statistical evidence to prove intentional discrimination. The court of appeals agreed with the district court that her statistical evidence wasn't reliable because her expert didn't identify who was potentially interested (as distinct from those who were qualified) for the position she sought.

Under questioning by Mr. Clark, Dr. Lauster distinguished between pre-election polls and election results, indicating that because he has the census figures, more sophisticated statistical analyses are unnecessary to know who won. The issue in a housing discrimination case, though, isn't simply who won, but also identifying the cause of that result. Knowing who won the election doesn't disclose why the election came out as it did. Identifying the cause requires the sort of statistical analysis that Dr. Lauster felt unimportant.

Dr. Lauster's disparate impact analysis is too blunt to provide any assistance to a trier of fact trying to decide whether the 2007 amendment to Oakhill's bylaws impacts minorities and non-minorities differently. Since his analysis doesn't describe the ethnicity of those who otherwise would be prospective renters at Oakhill — he looks only at the ethnicity of those who already live near Oakhill and within the county[9] — no trier of fact could be helped in deciding whether the bylaw amendment affected prospective minority Oakhill renters more than it affected prospective non-minority Oakhill renters.

5.

Nor does Dr. Lauster's analysis provide the Clarks with evidence of intentional discrimination. Dr. Lauster noted that the Oakhill census tract has a higher percentage of rentals than the others groups of tracts, but a lower percentage of minority residents. This, he reported, implies that "some selective force outside of the scope of the statistical analysis here" has impeded minorities from renting in the area. "Research suggests," Dr. Lauster reports, "that racial and ethnic discrimination on the part of landlords is widespread in the United States,"

---

[9] Dr. Lauster's analysis also ignores the challenging question of how the population base that Notre Dame attracts compares to the population base of the county as a whole. One with only a passing familiarity with the University of Notre Dame would think it attracts more students (who might be prospective renters) from outside the county than from within (as distinct from a community college or a residential branch campus of a state university). But Dr. Lauster's analysis does not address such in-migration issues, leaving the county's ethnic composition of uncertain relevance.

so such discrimination might be the "selective force" his statistical analysis suggests.

This may be fine as sociological discourse and would be reasonable insofar as it might suggest the need for further research. Dr. Shingleton testified that the most common method of research into the existence of discriminatory landlord conduct is the audit, in which persons posing as renters are sent into the area and their experiences are studied. Dr. Lauster agreed that an audit is the way to study intentional discrimination, but said an audit wasn't necessary for his opinion because he was studying disparate impact, not intentional discrimination. Mr. Clark cannot defend Dr. Lauster's scientific method as appropriate for the topic of disparate impact rather than intentional discrimination, then rely on the opinion Dr. Lauster's method produced as evidence of intentional discrimination.

Audits aside, Dr. Lauster's opinion cannot provide assistance to a trier of fact looking for some evidence of intentional discrimination. When offered for that purpose, the opinion is nearly tautological: the census data can't explain the ethnic composition of a particular census tract, but since landlords elsewhere are known to discriminate, the unexpected ethnic composition results from discrimination by landlords. Such reasoning is not evidence of the sort that supports injunctions.

III.

The Clarks have no probative evidence whatsoever of discriminatory effect or of discriminatory intent. They cannot prevail on their claim under the federal Fair Housing Act as understood in Metropolitan Housing Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283 (7th Cir. 1977). Because they cannot prevail under the federal Act, there is no chance of success under the corresponding Indiana act, given the Indiana Supreme Court's view of disparate impact in Villas West II of Willowridge Homeowners Assoc., Inc. v. McGlothin, 885 N.E.2d 1274 (Ind. 2008). The Clarks have not demonstrated a better than negligible chance of success on the merits of either of the claims on which they seek preliminary injunctive relief, so the court needn't balance harms: the Clarks are not entitled to an injunction. The court DENIES the plaintiffs' motion for preliminary injunction [docket # 6].

SO ORDERED.

ENTERED:     September 15, 2008


       /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court